UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,
    Plaintiff,

Cr. No. 19-20203

v.

Hon. Arthur J. Tarnow

D-3 RONNIE BROOKS,
    Defendant.
_____/

### UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE (ECF No. 71)

Ronnie Brooks has been in and out of jail since he was 18 years old. He has passed forged checks, possessed and distributed controlled substances, fled from police, twice, and assaulted two individuals, among other offenses. He has four prior felony convictions and on several occasions violated conditions of his probation. Yet, none of these sentences deterred Brooks from further criminal activity. On October 18, 2018, Brooks traveled to Chicago with his co-defendants, picked up 3 kilograms of cocaine and 75 grams of heroin, and returned to Southeast Michigan where he was stopped by police. But for the intervention of law enforcement, Brooks and his co-conspirators would have further distributed the drugs into the Eastern District of Michigan.

1

Brooks began serving his current sentence on November 25, 2019. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

Brooks does not satisfy the substantive requirements for compassionate release.] "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). The government agrees that Brooks' circumstances—including his heightened risk for severe complications from Covid-19 based on his confirmed "at increased risk" CDC risk factor—qualify as "extraordinary and compelling reasons" for release. Brooks' offense and criminal history make him a danger to the community and the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release. His motion should be denied.

**Background**

In June 2018, authorities learned that Markeith Lee Browning was distributing kilogram quantities of cocaine and heroin in the Eastern District of Michigan. (PSR ¶ 12). Investigators also discovered that Browning's source of supply was based in the Chicago, Illinois, area. (*Id.*). Further investigation revealed that Ronnie Brooks and others conspired with Browning to distribute

2

narcotics. (*Id.*) Between October 2018 and January 2019, several controlled buys were made involving these defendants. (*Id.*)

On October 18, 2018, Brooks was driving a Mazda Tribute, which was registered to his co-defendant Jimmy Hawkins, when authorities pulled him over on Interstate-94 near Paw Paw, Michigan. (PSR ¶ 13). According to investigators, Brooks appeared to be following a black Ford Fusion bearing an Illinois license plate number. (*Id.*). Brooks told investigators that he was returning from Chicago. (*Id.*). Authorities requested a K-9, which positively alerted to the odor of narcotics. (*Id.*) When authorities searched Brooks' vehicle they discovered nearly three kilograms of cocaine and 75 grams of heroin hidden in a compartment within the rear fender wells of the vehicle. (*Id.*). Police also stopped the black Ford Fusion and identified the occupants as Markeith Browning and Jimmy Hawkins. (PSR ¶ 14). Browning told police the he was also returning from Chicago. (*Id.*).

Brooks initially lied to investigators and claimed he was forced to go to Chicago and pick up drugs for "Keys." (PSR ¶ 15-17). Brooks told agents that he met "Keys" at a gas station off of I-94 on October 17, 2018 and followed him to Chicago in the Mazda but claimed he did not know that the car was loaded with narcotics. (PSR ¶ 15).

Agents identified a Mobil gas station in Michigan, at 10950 Belleville Road in Belleville. (PSR ¶ 16). Gas station surveillance video showed Brooks arriving at

3

the station on October 18th in a silver SUV; Hawkins arrived in a black Ford Fusion; and Browning was subsequently observed exiting the front passenger seat of the silver SUV and entered the driver's seat of the black Ford Fusion. (*Id.*). The silver SUV then followed the black Ford Fusion out of the gas station lot. (*Id.*). Brooks, Browning and Hawkins were also identified on hotel surveillance video in Chicago entering the hotel together at approximately 5:00am on October 18th. (*Id.*) Hotel records reflect Browning made the reservation using an American Express card. (*Id.*).

On April 2, 2019, Brooks was arrested and interviewed again. (PSR ¶ 17). This time, Brooks admitted that he went with Browning and Hawkins to Chicago on October 18, 2018. (*Id.*). Brooks acknowledged that he was recruited as a driver for the Browning Drug Trafficking Organization, that he drove individuals around who were selling drugs for Browning and that he was compensated with crack cocaine. (*Id.*). Brooks also admitted that he had made a total of approximately three trips to Chicago. (*Id.*).

Defendant Brooks was named in counts 1 and 2 of a three-count superseding indictment on May 22, 2019. (PSR ¶ 3). Count 1 charged Brooks with conspiracy to possess with intent to distribute a controlled substance (over 500 grams of cocaine), in violation of 21 U.S.C. § 846. (*Id.*). Count 2 charged Brooks with possession with intent to distribute controlled substances in violation of 21 U.S.C.

4

§ 841(a)(1). (*Id.*). On July 29, 2019, Brooks pled guilty to Count 1 of the superseding indictment pursuant to a Rule 11 plea agreement. (PSR ¶ 8). On November 25, 2019, this Court sentenced Brooks to 40 months. (ECF. 52: Judgment).

Brooks began serving his prison sentence on November 25, 2019, and is currently incarcerated at Federal Correctional Institution (FCI) Terre Haute in Indiana. In December 2019, Brooks made a sexual proposal/threat and was sanctioned by the facility. (Gov. Ex. 1 - Brooks Disciplinary Record). He has no other disciplinary history in prison. (*Id.*). Brooks is 38 years old, and his projected release date is October 10, 2021. Among other medical conditions, Brooks suffers from hypertension and Type 2 diabetes. (Gov. sealed Ex. 2 – Brooks' medical records). Brooks has moved for compassionate release, citing his medical conditions and the Covid-19 pandemic. Brooks has exhausted his administrative remedies, having been denied compassionate release by the warden. (Gov. Ex. 3 - Brooks RIS Request 6/21/2020), (Ex. 4 - BOP Resp. 7/23/2020).

# Argument

I. **The Bureau of Prisons has responded to Covid-19 by protecting inmates, instituting the administration of the vaccine at its facilities, and increasing home confinement.**

   A. **The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

At the outset of the pandemic, the Bureau of Prisons started modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* [BOP FAQs: Correcting Myths and Misinformation](#). When visitation is permitted at an institution, the visits are non-contact, require masks, and social distancing between inmates and visitors is enforced, either via the use of plexiglass (or similar barriers), or physical distancing (i.e., six feet apart). Visitors are screened for Covid-19 symptoms and their temperature is checked. Visitors who are sick or symptomatic are not allowed to visit, and inmates in quarantine or isolation cannot participate in social visiting. *See* [BOP Modified Operations](#). But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month, and legal visits are accommodated upon request. *See* [BOP Modified Operations](#).

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

7

### B.   The Bureau of Prisons is receiving the Covid-19 vaccine and is in the process of administrating the vaccine in its facilities.

As of January 22, 2021, the Bureau of Prisons has acquired 24,750 doses of the Covid-19 vaccine and is distributing it to staff and inmates. CDC Covid-19 Vaccine Tracker. The Bureau of Prisons has already initiated the first dose of the vaccine in 17,316 of staff members and inmates. While the precise timing of each inmate's vaccination will depend on many factors, the Bureau of Prisons is working swiftly to vaccinate inmates who consent to receive the vaccine.

The Bureau of Prisons has also taken significant steps to protect all inmates, including Brooks, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). The Bureau of Prisons also continues to assess its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of January 19, 2021, this process has already resulted in the BOP releasing at least 138 inmates who were sentenced in the Eastern District of Michigan. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 961 F.3d at 845.

## II. The Court should deny Brooks' motion for compassionate release.

Brooks' motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). And as the Sixth Circuit has held, this statutory exhaustion requirement is mandatory. *Alam*, 960 F.3d at 832–36.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for release. 18 U.S.C. § 3582(c)(1)(A). The defendant's "generalized fears of contracting Covid-19, without more," do not satisfy this

9

requirement. *United States v. Jackson*, 2020 U.S. App. LEXIS 32269, at *6 (6th Cir. Oct. 13, 2020); *accord United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *2 (6th Cir. May 21, 2020).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020). As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

Resolving the merits of a compassionate-release motion involves a "three-step inquiry": a district court must (1) "find that extraordinary and compelling reasons warrant a sentence reduction," (2) "ensure that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," and (3) "consider all relevant sentencing factors listed in 18 U.S.C. § 3553(a)." *Elias*, ___ F.3d ___, No. 20-3654, 2021 WL 50169, at *2 (6th Cir. Jan. 6, 2021); 18 U.S.C. § 3582(c)(1)(A). In *Elias*, 2021 WL 50169, at *2, the Sixth Circuit held that USSG § 1B1.13 is not an "applicable" policy statement for defendant-initiated motions for compassionate release. The government disagrees

with that holding and preserves for further review its argument that § 1B1.13 remains binding. But, given the Sixth Circuit's holding in *Elias*, controlling circuit precedent now forecloses that argument before this Court.

The government agrees that Brooks' circumstances qualify as "extraordinary and compelling reasons." Brooks' medical records establish that he has Type II diabetes mellitus which the CDC has confirmed is a risk factor that places a person at increased risk of severe illness from Covid-19. And he suffers from Hypertension which *may* place him at an increased risk.  *See* CDC Risk Factors (as updated). Given the heightened risk that Covid-19 poses to someone with those medical conditions, Brooks has satisfied the initial eligibility criteria for release under § 3582(c)(1)(A).

### A. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons," he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. 18 U.S.C. § 3582(c)(1)(A). A defendant's failure to establish that the § 3553(a) factors support relief is an independent basis for denying compassionate release. *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020); *accord United States v. Austin*, 825 F. App'x 324, 325–27 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors);

11

*United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (same). So even if the Court were to find that Brooks established extraordinary and compelling reasons for his release, the § 3553(a) factors should still disqualify him.

The plain language of the compassionate-release statute makes the point even more directly: it requires that the defendant's reasons for release "warrant such a reduction" in his sentence. 18 U.S.C. § 3582(c)(1)(A)(i). That inquiry depends, at least in part, on the length of time remaining on the defendant's sentence, requiring him to justify the magnitude of his requested sentence reduction. *Id.* So a defendant with many months left on his sentence, like Brooks, must show that his reasons for release are so powerful that they "warrant" a "reduction" of that size. *Id.*

Brooks' prior conduct has made him a resident of the criminal justice system for nearly 20 years. (PSR ¶ 33-43). When he was 18 years old, Brooks passed two false checks totaling $900. He was convicted of Uttering and Publishing and was sentenced to six months in jail and two years' probation. (PSR ¶ 33). Brooks violated the terms of his probation when he committed another offense. (*Id.*). In 2001, Brooks was convicted of Assault and Battery and sentenced to 60 days probation. (PSR ¶ 34). Once again, Brooks violated his probation and was sentenced to 30 days in jail. (*Id.*). Brooks escalated his criminal behavior in 2004. After the Michigan State Police (MSP) conducted a controlled buy of marijuana,

12

they followed the seller to a residence. (PSR ¶ 35). Inside, MSP observed Brooks throw a bag of cocaine on the floor. (*Id.*). Brooks was later convicted of possession of cocaine and sentenced to 180 days in jail. (*Id.*).

Two fleeing and eluding convictions in 2007 resulted in sentences of 1-5 years in prison and 6 months in jail, respectively. (PSR ¶¶ 37, 38). His previous probationary sentences have often resulted in violations for failure to comply. (PSR ¶¶ 33, 34, 43). In 2018, Brooks sold crack cocaine to an undercover officer. (PSR ¶ 43). He was later convicted of delivery/manufacture of less than 50 grams. (Id.). Brooks was sentenced to 31 days custody and two years' probation. This factor does weigh in favor if release.

The circumstances of this offense are serious. The offense is societal and causes greater damage each year. Drug trafficking and the subsequent use of drugs play a predominant role in the degradation of our communities, and Brooks contributed to that by participating in this conspiracy. Equally as troubling is that Brooks knows the personal impact of drug abuse and yet assisted drug addicted users to continue their addiction by delivering drugs to them. Distribution of illegal, destructive drugs in a community causes damage to that community. "Society as a whole is the victim when illegal drugs are being distributed in its communities." *United States v. Green*, 532 F.3d 538, 549 (6th Cir. 2008); *United*

*States v. Hodges*, 641 F. App'x 529, 532 (6th Cir.), cert. denied, 137 S. Ct. 134, 196 L. Ed. 2d 104 (2016).

Brooks remains a danger to the public. Particularly concerning is the failure of prior criminal sentences to deter Brooks from recidivism. Since 2000, Brooks has continued to commit criminal offenses, including drug trafficking and assault, after involvement by courts and probation departments. There is no reason to believe that Brooks will suddenly comply with Court supervision if released. As a result, this factor does not weigh in favor of release.

Finally, Brooks has served approximately 21 months of his 40 month sentence. When conducting a § 3553(a) analysis in the context of a compassionate release motion, a district court may properly deny relief when a defendant has served only a fraction of their sentence. As another judge in this district explained, releasing a defendant who committed an "undeniably serious" offense, and who has "only serv[ed] about a third of his sentence," "would not promote respect for the law or proper deterrence, provide just punishment, and avoid unwarranted sentencing disparities." *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020); *accord United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020). That conclusion applies here, since Brooks has only served 50% of his sentence. The nature and seriousness of this offense, Brooks' lengthy criminal record and his continued danger to the public do not favor release.

14

Furthermore, Brooks' record casts significant doubt on whether he would abide by the release conditions and social-distancing protocols that could diminish his risk of contracting Covid-19 if released from custody. Although the *average* person might have a higher risk of contracting or developing complications from Covid-19 in prison than if released, an *individual* defendant's risk varies widely. It depends on a long list of variables, including the precautions at his prison, the number of Covid-19 cases there, the prison's medical facilities, his access to medical care if released, and the threat from Covid-19 at his release location. A defendant's risk of contracting Covid-19 also depends not just on his opportunities for social-distancing, but on his willingness to take advantage of those opportunities and engage in social-distancing for the pandemic's duration. Brooks has consistently demonstrated a failure to abide by court orders and has failed to follow the requirements of court-ordered probationary conditions. As a result, Brooks is unlikely to abide by release restrictions and therefore more likely to expose himself and others to Covid-19.

### III. If the Court were to grant Brooks' motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Brooks' motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

15

## Conclusion

Brooks' motion should be denied.

        Sincerely,

        MATTHEW SCHNEIDER
        UNITED STATES ATTORNEY

        *s/Timothy P. McDonald*_____
        Timothy P. McDonald
        Assistant United States Attorney
        211 W. Fort Street, Ste. 2001
        Detroit, MI 48207
        (313) 226-0221
        timothy.mcdonald@usdoj.gov

Dated: January 25, 2021

## CERTIFICATE OF SERVICE

I certify that on January 25, 2021, I electronically filed this brief for the United States with the Clerk of the United States District Court for the Eastern District of Michigan using the ECF system, which will send notification of the filing to the following attorney of record:

Rafael Villarruel, Federal Defender's Office

*/s/ Timothy P. McDonald*
Timothy P. McDonald
Assistant United States Attorney